Next matter involves consolidated cases 4100904 Minson v. Pneumo Abex at Owl and 4100921 Minson v. Honeywell International for the appellant Mr. Simpson, Mr. Hepp, and for the appellee Mr. Wilder. Are you guys going to be splitting time? Yes, Your Honor, we will be. Okay. Before I take anybody's time, I thought I'd just ask a question maybe to both sides. Any idea when we might get some guidance from the Supreme Court on these types of cases? I think the best guess as far as the ELA is beginning of March, but that's just a guess. Is that the case from the Fifth District? Oh, as far as the Simpsons' case? On household exposure, they argued that September 24th, I believe, so they've had it for a while, on household quantities of the cargo and household disposal cases. And as far as, I think Reagan was referencing the ELA's, I don't know if it's a problem or a bigger issue with the ELA. I know the Constitution was written around the time of that. Is it pending on the PLA calendar for March? I don't think it is. Okay, having said all that, if it's helpful at all, I don't know, but please proceed. Thank you, Your Honor. My name is Reagan Simpson. I'm appearing here for MIMO APEX LLC, often called APEX in this litigation. On behalf of APEX, we request that the Court decide this case on the principles that were announced by the Court's decision in the Rodarmo opinion. The facts of this case, except for the household exposure, because this is a direct exposure case, the facts of this case, as far as conspiracy is concerned, are identical. Every exhibit that the Court cited in the Rodarmo opinion is in evidence in this record. The only difference being that plaintiff's exhibit 400A appears in the record as APEX 380. You're saying there's no additional evidence here? 638 and 639. As far as APEX is concerned, there is three additional exhibits concerning APEX. What I was saying was that every exhibit that the Court cited in the Rodarmo opinion is in the record. The only difference being that 400A is instead APEX 638 and 639. As far as APEX is concerned, there were three additional exhibits that were admitted into evidence. Plaintiffs 210, 217, and Plaintiffs 326. They are not consequential as far as the conspiracy allegations in this case. 210 are interrogatory answers that deal with subjects of when APEX made breaks containing asbestos, when APEX put a warning on breaks, and when APEX knew of the hazards of asbestos. Counsel, what about this as a thought? Looking at Rodarmo, how is it pronounced? Rodarmo? Rodarmo. Rodarmo. The Court there spoke about the focus of inquiry being, if I understand correctly, from the period of 1953 to 1956, primarily. And here we're talking about the time period involved from 1967 to 1969. So I suppose the question is, aren't there any differences in the nature or quality of the evidence that was presented with regard to the 1967 to 1969 period as opposed to the earlier one? Assuming I have it right in the first place about the earlier dates. The dates that you're citing are correct as far as the household exposure, and it was important to the household exposure issue on duty on whether it was foreseeable that a household injury could result from exposure to asbestos. And the Court held on that point, as it did in the Holmes case, that before 1964 it was not foreseeable that there was sufficient asbestos in a household situation to cause injury. This is a direct exposure case. Mrs. Minson worked at UNARCO, and she worked there from 1967 to 1969 as a secretary actually in the building. But this is still a civil conspiracy case, isn't it? That's correct. Well, let me read you this one sentence from an introductory paragraph of Rodarmo, talking about, first, how there was no duty, the Court concluded. But second, even if, arguendo, UNARCO owed Rodarmo a duty, the record appears to contain no evidence that in the period of 1953 to 1956 or prior thereto, either of the defendants actually, and here it's italicized, entered into an agreement with any other corporation to falsely assert that asbestos was safe or to keep quiet about the dangers of asbestos, although the record contains evidence of defendants in their own account and on their own individual initiative did those things. So it's not just 1953 to 1956 with regard to the question of home exposure. It was the civil conspiracy focus as well. So, going back to my question, we're talking about 1967 to 1969 here, are we not? We're talking about 1967 to 1969 as far as Jane Minson's exposure is concerned. Okay, so the question is, assuming that we would accept Rodarmo, now this is a different panel, the same court, and as I think you know, notwithstanding Mr. Wilder's request that we overrule it, the Supreme Court has made pretty clear we can't. So we can disregard it. I don't understand that. How does Rodarmo get to overrule Burgess? Well, I don't think. We can't overrule. No, no, I think overrule isn't the right term. I think the Supreme Court said we could disregard it if we were so inclined. But my point is, tell me about the 1967 to 1969, and when you say it's essentially the same case, wasn't there anything different or new or whatever with regard to that? No, the evidence is exactly the same, and the evidence in the record is exactly the same for the court to consider, that parallel conduct, it was parallel conduct that ABEX didn't warn its employees, didn't put warnings on breaks in 1967 to 1969, just as there was in prior years. Well, the focus of Rodarmo in particular was what evidence was there, that defendants actually entered into an agreement with any other corporation. So my question is, and I suspect it would be Mr. Wilder I would ask this of, he would more likely be the source of the information, but my question is, is there any evidence in this record from which it could be said, C, there is evidence of the conspiracy in 1967 to 1969 differing from Rodarmo? No. The evidence is that there was parallel conduct among the defendants and not warning employees and not warning customers who bought their products. McClure, as the court knows, held that parallel conduct by itself is insufficient. As far as ABEX is concerned, and the focus of ABEX, that was really the Saranac Agreement, and that spanned the years 1936 to 1951. Well, counsel, I don't want to take up any more of your time. I thought this was an important preliminary inquiry, and now I'll let you go ahead with your argument. All right. Thank you, Your Honor. So the parallel conduct that has been presented is the failure of the companies to warn employees and to warn customers of their products, and that is consistent throughout both of the cases. As far as ABEX is concerned, the allegation is that there was additional evidence beyond parallel conduct as far as the Saranac Agreement in 1936 as Plaintiff's Exhibit 100 and the publication in 1951 of Plaintiff's Exhibit 105 without the reference to the tumors in the mice. As far as ABEX is concerned, there's no additional evidence in the record besides the exhibits that I mentioned that are inconsequential as far as conspiracy allegations are concerned. And if anything, in this case, the record is less, it's actually even stronger as far as supporting the renormal opinion. You know, it seems to me, and you know that I wrote Burgess, so you know what I said there. I understand. But the thing we should be looking at is McClure, the Supreme Court's decision in McClure. And there, one of the things that struck me about that was they cited the Burnside case, which complained there was no affirmance of meetings, conferences, telephone calls, joint filings, cooperation. We have all that with ABEX. ABEX was a part of this right from the very beginning. Like you said, Saranac, Hamlin, and his connections with, what was the guy's name, Gardner? Leroy Gardner. The general counsel of Johns Mansville. There was parallel conduct, certainly, but there was a lot more than that with regard to ABEX. How do we ignore that? It's not to be ignored, Your Honor, and what the evidence shows is, to summarize it, is Dr. Gardner, the researcher, in 1943 wrote his initial report to the sponsors saying, I have found these tumors in these mice. He said it's better to omit this from the research. And he explains in the outline that's attached, as plain as ABEX 639, that the reason that it is of no significance is there were no controls. It's a small number. But look at the agreement part. All these companies agreed to finance this experiment. There was evidence they did it in an attempt to help themselves. There was evidence that asbestos was a problem even before that. And then the discussions between your Dr. Hamlin and Brown, Van Diver Brown, the general counsel of Johns Mansville. You know, just was there an agreement? Yeah. Was there cooperation? Yeah. This isn't two companies doing the same thing without any connection. Your Honor, McClure requires an agreement to do something unlawful. And the best way I can say it in the short time I have before the court is to say it this way, that it is not unlawful to agree to accept the researcher's own recommendation that his finding, which he says means nothing, not be published. That's not an unlawful agreement, nor is it a tortious act. McClure requires an agreement to do an unlawful thing, and it requires a tortious act. Dr. Gardner said in exhibits that are in evidence in this case, he said it in Apex 641 to Dr. Hechton, who was with the National Cancer Institute, that my results mean nothing. And it is not unlawful to agree to the researcher's recommendation that his finding not be published. And then Dr. Diver-Brown insists that all the preliminary reports be collected. We don't want that information to get out. And Dr. Hamlin reluctantly agrees to that. All I can say in my time is up, if I may answer the question. Please. Thank you. Is that it is not unlawful, and you have to have an unlawful agreement in a conspiracy case. It's not unlawful to agree to the researcher's request that his findings not be published because they mean nothing. It's not a tortious act not to publish findings that have no scientific significance. And so for that reason, those two elements that are required in conspiracy are not met in this case. Okay. Thank you. Please, the Court. My name is Steve Haft, I represent Honeywell. To address Your Honor's questions, Honeywell, the evidence against Honeywell in this case is akin to the evidence against PCC in Burgess 2. We were not part of Saranac, and so the discussion about Saranac does not relate to Bendix. You hired Saranac to do a test, didn't you? No, Your Honor, we did not. Independently, you did not? Okay. What about Dr. Lanza? The only time we worked with Dr. Lanza was in silicosis. We exchanged letters with him in the early 1930s about silicosis. He was a noted dust specialist, and we asked him to look at x-rays regarding silicosis. There was never any communication in the record of any communication between MetLife or Dr. Lanza and Bendix regarding asbestos in any fashion. Counsel, I have a tough question for you here. It's kind of strange. It's a question I'm going to also ask Mr. Weld. As you heard Justice Cook and I speak a moment ago, we have conflicting decisions in this Court. We have the recent Ronarmal case. We have the Dukes case and Burgess, which is the earlier case that he wrote. Dukes and Burgess have gone, lack of a better way to put it, one way. Ronarmal has gone the other way. It's the more recent, but there it is. This panel is an independent entity of this Court, and we can choose to follow either line or come up with a third for that matter. Why should we adhere to the more recent Ronarmal case instead of Dukes and Burgess? Your Honor, I think that, first of all, Dukes itself is entirely inconsistent. The Dukes had said there was not sufficient evidence of conspiracy to allow in the hearsay, but then it said there was sufficient evidence of conspiracy to justify denying the JLB.  I think Ronarmal is consistent with the first, which said there is no independent evidence of a conspiracy, and it disagrees with the second. So I think there is reconciliation of Ronarmal with Dukes in that score. With respect to Burgess 2, as to my client, we are – Ronarmal is consistent with Burgess 2 in terms of looking at the evidence and the quality of the evidence. What about the shared directors? They did share directors, Your Honor, but there's no evidence that those directors ever communicated with each other or through each other. Why do companies share directors? I can't answer that question. Isn't that illegal? I don't think it is unless there's a showing under the antitrust laws, which is not shown here, of an anti-competitive effect. So I don't – that was not the evidence in this case. There's a reference in briefs. You know, and again, I can see if two companies are going their own route and doing bad things and there's no connection between them, there's no conspiracy. Well, my gosh, sharing directors? You knew exactly what Johns Mansville was doing. Johns Mansville knew exactly what you were doing. Your Honor, there's no evidence of that in the record, because for a brief period of time at one time or another they shared directors, that would mean each company knew fairly what the other was doing. Moreover, even if we knew everything Johns Mansville was doing, that does not prove a conspiracy. If doing that satisfied our own interests, that's innocent conduct and it's not evidence of a conspiracy. By the way, did you file a petition or was it your side, I can't remember, filed a petition for a certificate of importance in Rhode Island? Yes, we did, Your Honor. Now, again, this is a little strange. You won, didn't you? We did, Your Honor, but we recognized the question that you raised with respect to Duke still being there and, as you mentioned, you're an independent panel. You can decide one way or the other or a third way and we thought at that time that resolution was important. Here's another kind of strange question. Again, I'll be interested in Mr. Melder's thoughts on this. Following Justice Turner's inquiry at the beginning, and I think it's correct, that this case will be on the PLA list for the March term, which will be resolved at the end of March after the March term is concluded and the Supreme Court will tell us, likely, there's no guarantee, but likely will tell us whether or not the PLA will be granted and they will address this case and come up with a definitive determination. So here's my question. Why shouldn't we wait until then, even if we might have an earlier decision, to wait and see what the Supreme Court says? And if they grant the motion, hold this case in abeyance, and if they deny the PLA, then proceed? I have no good answer for that, Your Honor. Do you have any problem with our waiting? I don't have any problem personally with your waiting, Your Honor, and I can't speak for the other parties, but it seems to me we already have the split within the Fourth District and we have a PLA pending. I would think that unless you have a different view than one of the two that's been expressed, either Dukes or Redarmo, that if the PLA is granted, that should be repelled. But I obviously don't control that. Counsel, when you first began speaking, I'm sorry. No, go ahead. When you first began speaking, you emphasized that Honeywell did not help in financing the Saranac study. Yes, sir. Does that make your defense in this case, we'll say, stronger than that of Abex's? Very different. Whether it's stronger, I guess, depends on who's listening to the story. But it's very different because there's a lot of time spent in these cases on the Saranac agreement. We have no connection with that. In fact, there's an exhibit, I can't remember the number, where the results of the Saranac were kept with the Saranac sponsors, not shared with anything outside the group. So it makes it a very different case. And if you conclude Saranac's evidence of a conspiracy, it doesn't apply to us, obviously. If I could just touch on a point with respect to the point someone asked about new evidence. On that score, I would simply ask you, there is additional evidence in this case that was not in Redarmo, but it is not additional evidence on the point of an agreement. And if you look at the plaintiff's post-Redarmo supplemental brief they filed in this case, they go through and chronicle all of the evidence, what they call the new evidence, and they explain why it's relevant to the case. And they don't explain how it could be relevant to an agreement. For example, at page 6 of their supplemental brief, they list 15 exhibits, they call the post-1972 exhibits, which they claim are relevant to this case. Why are they relevant? Because according to the plaintiff, these exhibits, quote, show Honeywell had knowledge of the hazards and failed to inform workers. That's the same parallel comment. He knew and didn't tell. The Redarmo court said there was evidence, but it doesn't go to agreement. They cite plaintiff's exhibits 783, 791, 796, 809, and 815. They say those are relevant. Why? Because they say these exhibits are admissible to, quote, show Bendix's knowledge of the hazards of asbestos and its failure to tell the workers. That's at page 9 of the supplemental brief. Again, just more evidence of what we've called parallel conduct. It doesn't go to agreement. In fact, the plaintiff says that this knowledge, the failure to tell of Bendix, is something the court in Redarmo agrees the evidence showed. So the new, the additional evidence in this case is just duplicative of what was shown in Redarmo about knowing and not telling, but it doesn't go to the issue of agreement, which is the issue we're talking about here today. Finally, there's a whole host of these, and as you read each example, the plaintiff refers to exhibit 815, which they describe as one of the most significant new documents. Why? According to the plaintiff, quote, this exhibit demonstrates as early as 1958 Bendix was aware of the hazards of asbestos and knew it had the obligation to tell workers. Again, that's not the issue. That's more parallel conduct, knowing and not telling. It does not say anything about an agreement. So your contention is that for 67 to 69, this record contains no additional evidence that would support the existence of a civil conspiracy. That's correct, Your Honor. Okay. That'll be the next question for Mr. Wilden. All right. If I could turn just very briefly. With no evidence of these civil conspiracies, how does Mr. Wilden continue to talk these juries to unanimously saying there are conspiracies? Mr. Wilden is a very excellent attorney. He's very persuasive. As both of you are. So I asked the same question myself after being on the losing end of a couple cases. How did they believe that? But he doesn't. But I don't think the question here is whether or not he's a very good attorney who's persuasive. It is whether or not there's evidence in the record to survive under the McClure standard, which I don't believe there is. And Rodamos said not. If I could, there's one other issue I'd like to touch on briefly. It's the evidence of other companies, what they knew and didn't tell. We put in the record the offer of proof from their expert, Dr. Kassaman, who said that Bendix's conduct was like that of thousands of other companies and governments in terms of knowing and not telling. Since McClure said that you look at conduct to see if it's equally evidence of innocence than of guilt, in this case the plaintiff was allowed to put in the evidence of what they called the guilty parties to show they knew and didn't tell. We were not allowed to put in the evidence of the innocent parties to show we acted just like them. So we could not compare and contrast our conduct to that of innocence. What was the argument against your evidence? I'm sorry? What was the argument against your evidence? In the appellate court, there are three arguments. One is this would require many trials from each defendant. It's not true. We followed Dr. Kassaman's offer of proof. It takes up about 16 pages of the record. The evidence is there. Second, the point was raised, well, we'd have to prove not only parallel conduct to these other companies, but parallel conduct plus, just like the plaintiff has to prove. That's not true. We're not trying to prove the other companies are conspirators. We're simply trying to show they acted like we did in these two points of circumstantial evidence, knowing and not telling. And as to those points, we should be allowed to rebut and say, we're just like all these thousands of other companies and governments. The third point that was raised is it said that an argument that the government should regulate is inappropriate. We're not arguing about government regulation here. The government had thousands of employees working with asbestos. The federal government and the state governments, according to Dr. Kassaman, knew for decades that asbestos hazards had never won their employees, just as what we were accused of doing. So we believe we should have been allowed to tell the jury, if you're looking at circumstantial evidence, know all of the circumstances and let us compare our conduct not just to the small group of entities the plaintiff has chosen, but to the entire American universe of companies. My time is up if there are any questions. I think we'll have some rebuttal. I assume you two are going to split rebuttals as well? Yes, three minutes and two minutes, Your Honor. All right, very well. Mr. Wilder? Jim Wilder from the plaintiff. I'm asking to affirm the verdicts, and I want to talk primarily about sufficiency of the evidence to deny the request for judgment, not abstaining from the verdict. As to both defendants, I want to start off with ABEX more so, and that addresses one of Justice Steigman's questions. Why should we adhere to Redarmo or adhere to Burgess or whatever? I'm suggesting, not surprisingly, that Burgess won in two and all the other cases. In fact, every case up to Redarmo said that Saranac involves suppression, even the Supreme Court in McClure at pages 113 and 114 talk about the fact that other companies have been shown they've suppressed. Redarmo, with all respect to the majority, two judges in the majority in Redarmo, seems to misapprehend the nature of the plaintiff's claim here, because the plaintiff's claim is that the conspiracy is a failure to tell exposed people, employees and customers, of the hazards known. We have parallel conduct, no dispute, that shows, for instance, ABEX and Johns Vanville did that. Is there other evidence that would show there's an overt act? The tort in this case is they didn't tell the workers and the customers. Are there overt acts that would suggest direct evidence that would suggest there's evidence? The Redarmo majority seems to think that each overt act has to be a tort, that all the direct evidence has to be tortious. I think Justice Cook got it right in Burgess, too, at page 903, when he said that the jury could have decided that ABEX's return of the report, the Saranac report, was a tort, a tortious act, as were ABEX's employee publications that made no reference, because ABEX admitted, Exhibit 299-D in this case, as their interrogatory answers, they admit they knew in 41 and told in 78. They admit that under oath. Could have found the publications that made no reference to asbestosis, cancer, or industrial dust hazards. The jury could have found that any number of actions by a narco constituted a tort. So not every act. The Saranac evidence is evidence to show it wasn't a coincidence that they knew and did not tell, to show that they had contact and they did agree on things. Now, in Burgess and in every other case, it's been determined that was wrongful. In McDermott, the majority says, well, they go off on the mice and scientific value, and I want to talk about that if I get a moment. But the majority in McDermott concludes, in paragraphs 123 and 124, that you can infer that the financing corporations, including ABEX, had self-serving reasons for omitting that. That Castleman, Dr. Castleman, might have been right that if it had been published, it would have hurt the companies. And they say in paragraph 124, the sponsors could have done the right thing for the wrong reason. In other words, that it was bad science and that was the right thing to keep it out. The wrong reason was, as they go on to say, even if it had been nothing, publicizing them could have been prejudicial to Johns Manville's business or Johns Manville could have had that fear. So yes, it is an eminently reasonable inference that Johns Manville, ABEX, and other companies were concerned more about their own skin than their scientific integrity. I agree with that. And I also say that's direct evidence that the McClure Supreme Court says you need, in addition to parallel conduct, to show that the parallel conduct is not a coincidence. It isn't two companies going like this or eight companies going like this. When ABEX and Johns Manville both know and don't tell, it's not a coincidence that they're not telling people. And, in fact, if you take what the majority said here in Rodarmo, that they did it for the wrong reason because they were trying to save their skin, that's support. That's support for the fact that it was a conspiracy. What about the distinguishing of Rodarmo on the dates that I indicated I was interested in? The fact that this is 67 to 69, you heard, I think it was Mr. Heff, to point it out that the things you identified as this was additional evidence and this should be on Rodarmo to the extent you want to distinguish it, it really isn't because it doesn't address the concerns expressed in Rodarmo. Bob, what's the evidence of the agreement? Two answers to that. The first one is an easy one. He mentioned page 6 of our supplemental brief. You should have read page 8 where we talk about exhibit 772, which is when Honeywell did finally decide to tell their workers, or Bindex, I call them Honeywell or Bindex, in the 70s, guess who they turned to? Johns Manville. They got the booklet from Johns Manville. That's exhibit 772. The booklet was wrong in terms of saying there were safe levels and you didn't need to worry about asbestos if you were exposed at low levels. They got that knowing Manville knew that was wrong and Bindex knew it was wrong because they'd gotten a position paper back in 68 from Manville to assist them. And that goes to the second part. To be honest, the exhibits during the period 67 and 69 are probably the same as in Rodarmo. 772 is new, but that's from the 70s. Same as in Rodarmo, but the significance of some of the exhibits differs. As to ABEX, it's during that period, 67 and 69, when Jane Minson is working, that ABEX exhibit 187 is the one where they hear there's going to be a label, not a warning, but a label that says it may be harmful and the vice president of ABEX writes to the medical director and says, I'd like your input because this could cause us repercussions if our people at Winchester get concerned about the hazards to their health. That's right during the period when Jane's going to work in Bloomington. If you take Honeywell, during that same period of time, exhibit 818 and 818A is when the Manville position paper comes. And I realize in Rodarmo they said, well, what Duke said about the Manville position paper doesn't make any sense because there's nothing wrong with Manville giving a position paper to Bindex. I agree there's nothing wrong with them giving it to Bindex, but there's something wrong when Bindex gets it and knows that Manville's sending in bags that just contain the word harmful and Manville has just given them paper that says it's long been known this stuff causes asbestosis, lung cancer, and mesothelioma. So Bindex knows, Manville knows, and isn't telling. And what does Bindex do on disputed trial? They continue to use it and not tell their own workers. And they're using 30 million pounds a year of Manville asbestos. That's during the period 68 when Jane Minson is also being. So there's a little more significance to it. But I can't tell you there's a bunch of new exhibits between 67 and 69. I can tell you there's new exhibits that show Bindex knew because Bindex is the one company that keeps saying we didn't know, unlike ABEX who says we knew forever and didn't tell and here's our excuse. But there is also an additional exhibit that's after 69 about agreement because when they did finally decide, because the government was forcing them, they needed to tell, they still didn't tell accurately and they turned to Manville for that. Speaking about government, what about the point that Mr. Heft raised about how if you were permitted to bring out actions of others, why shouldn't they have been permitted to similarly bring out actions of others, including the government, as to what they said or didn't say? Well, actually they did bring out and both sides brought out what the government did or didn't say. What the court prohibited was them trying to suggest that the government was at fault, that the government should have regulated them earlier and made them tell. That's actually something that was sort of suggested. It was brought out, what OSHA said in 72, it was brought out. It wasn't, they weren't allowed to say, well, look, General Motors knew and didn't tell. Perhaps I misunderstood. I thought Mr. Heft was arguing that the government's treatment of its own employees was similar to how its company treated its employees and it should have been permitted to bring that out to rebut the notion that this was some sort of conspiracy. And you objected and the court kept that out. I objected to the idea that you'd have to go through each entity, including the government, as to what they knew, why they didn't tell, if in fact they did know, they may not have known, when did they learn, why they didn't tell, and since it wasn't alleged the government was in the conspiracy, if they thought the government was a conspirator, they could have third-partied them. If there is error on that, it's error that requires a new trial. I don't think there's any error, but it's not error that gives them judgment O.V. What about the question I asked also, counsel, and it's a little strange, but I'm interested in your thoughts on it. It's your PLA, I think, on Rotarmo that's going to be coming up, I think. Two of them. Honeywell filed a PLA because they didn't like the conflict. You're correct. Why shouldn't we wait on a decision in this case, assuming we're going to have one before then, until we see what the Supreme Court has said, and if they grant it, frankly, wait until they resolve that case. Is there any reason why this matter would be so pressing that the Supreme Court should somehow need our guidance for an additional decision? I think two reasons, Judge. One, even if the PLAs are granted, I assume if they allow one, they'll allow the other. My PLA goes to household duty, of course, because Rotarmo's household, as well as the conspiracy findings. On what basis would they grant it? I don't know that you can tell that, so it might not give us any guidance two years down the road. It might be household duty, although I think Simpkins would cover that. But it might go to the foreseeability issue. And I assume they grant Honeywell's too, even though Honeywell's just goes to conspiracy. So just the granting of it wouldn't necessarily tell us anything. Well, it says we're going to get a decision. They're not like the Supreme Court, the U.S. Supreme Court. They don't say we're granting certiorari on the issue of so-and-so. They just grant it. They just grant it. So they got the whole case. Right. So we don't know what the decision will be on. It could be another household foreseeability issue. That's number one. And I try to stick to the records on these appeals, but you know from the years you've been doing this, all three of you know, people are getting sick and dying, and there are cases at the trial court. People are getting mesothelioma, and there are cases filed. And right now it is true. Dukes is there. Dukes I is there. Radarmo is there. Burgess is there. And there are some discrepancies among those discrepancies. You know what I mean. Differences. There's differences. So that's why I would suggest the decision could be of assistance, whichever way you come out. And should you adhere to Radarmo who failed to adhere to Dukes and to Burgess? And, again, I'm suggesting no. And if I could sort of backtrack back to that to ABEX for a second. I think part of the Radarmo majority's problem is they don't understand, again, the tort is fair to tell, and Saranac is just an overt act that shows some of the direct evidence that shows that it wasn't coincidence. When the Radarmo court says at paragraph 129, the agreement to suppress the tumorous mice really doesn't match up with the conspiracy allegations, they're right. It doesn't because the conspiracy allegations, as you didn't tell exposed people, the agreement to suppress the tumorous mice just shows that it wasn't coincidence. I tell jurors in rebuttal after they've heard all this, it doesn't matter if Saranac is good, bad, or indifferent science.  These companies weren't tough. Does Saranac implicate Honeywell's liability at all since they weren't involved in it? No. Not at all? Not even in the conspiracy theory? It shows, as to others, that it wasn't an accident. But there's no, I think we had this discussion with one of the earlier ones, I can't put Bindex here. We don't know who all was here on November 36th, but I can't put Bindex at the meeting, and they don't get copied on anything. ABEX was there. Anarcho was there. Johns Manville was there. Raybestos were there. And those last three are the ones whose products Jane Vinson was exposed to. They all got their numbered copy along with ABEX, and they all returned them because of the changes. I want to address one thing of fact. Mr. Simpson said, well, it can't be wrong to hold out what the researcher tells us you should hold out. Well, first of all, if you hold out for the wrong reason, I say that's support for the conspiracy. If you're holding it out because you're trying to, as Redarmal said, save your skin. That's really what Burgess found, too. But in addition, this idea that, Redarmal says, nobody really knows if their adenomas are cancer, and that Gardner himself said it shouldn't be published. You look at exhibit ABEX 638. What ABEX 638 says is Gardner says, here's the outline to the companies in 43 of what I'm going to publish. His outline has in there about the mice getting cancer at page 8. That's exhibit ABEX 638 and 639. One's a cover letter. One's the outline. His outline's got in there at page 3 the sort of summary at the front that it's experimental data shows that it's suggestive of cancer. His outline at page 8 says 81.8% of the mice got malignancies, and Gardner's a world-class researcher. He doesn't say adenomas. In fact, throughout the exhibits, it's talked about as pulmonary cancer by the sponsors and by Gardner. In the cover letter, what he says, and this is what ABEX is referencing, they say, well, the researcher said it should be omitted. If you look at that exhibit from February 24 of 43, he says the question of cancer susceptibility now seems more significant than I previously imagined. I believe I can obtain support for repeating it from the cancer research group. As it will take two or three years to complete such a study, I believe it would be better omitted from the present report. Now you can interpret that to mean the study that's going to take him two or three years should be omitted from the report because he was already years overdue on what he was supposed to have been doing from it. ABEX says its spin on that is that you should leave out all references to the mice, but that letter accompanies an outline that has the mice findings in there by Gardner that he says is what he's going to publish or what he's going to write. So it's at best a jury question as to whether he means you're omitting the findings that he puts right in his outline, or does he mean we're not going to wait two or three years, we're going to come up with a present report. Throughout the exhibits in the 40s and during that period, they talk about pulmonary cancer. ABEX relies heavily on the National Cancer Institute, and the redormal majority says, well, the National Cancer Institute says it's of no value. Again, even if it's of no value, if they kept it out for the wrong reason, it's direct evidence reflecting that the parallel conduct that resulted from the conspiracy was not an accident. But if you look at ABEX 651, the NCI transcript, it's true that they didn't give him the funding. And if you read the entirety of that, if you read like pages 21 through 26, part of the reasoning was one of them says, wouldn't it just be establishing another carcinogenic agent when it seems like a new one is found every week or so? That's what, you know, the city... Mr. Wilder, let me ask for some clarification. These are complicated matters, and you and other counsel are much more expert on it than I, and I'm trying to just get a handle here. In looking at the redormal case, the court wrote that the plaintiff sued defendants on a theory of civil conspiracy. Is that correct? Correct. Because if I understood you earlier, you were talking about that there was a basis for this tort claim that was beyond civil conspiracy. And maybe I just misheard. I may have lost you. What I'm saying is the civil conspiracy was they did not tell the people who were exposed, and in some instances misrepresented, okay? Well, but not telling people who were exposed wouldn't be a tort unless there was a conspiracy with others to do it. Isn't that correct? No. Each of them, if they had knowledge and didn't tell, that would be a tort in furtherance of the conspiracy. As Justice Cook said, in UNARCO, any number of actions by UNARCO would be a tort. Each of them would be committing torts in furtherance of the conspiracy, and that's what we argue. Each time they sell without telling, that's a tort, and that's in furtherance of the conspiracy. Each time they employ without telling, that's a tort, and that's in furtherance of the conspiracy. That's all parallel. Is there some evidence that suggests that it's not just these companies running parallel, some evidence that there's interaction between them, whether it be shared directors, 59 to 63, between Honeywell and JM, or whether it be shared directors in the 30s by ABEX and Bindex? Part of that evidence that shows it's not a coincidence or accident as to ABEX is what they did as to Saranac, because what they did as to Saranac was return their numbered copy, tell Johns Manville to act for them, not to defer, as ABEX says in the brief, but to act for them, and did it even though their medical director said he saw nothing bad, basically, in the report. He thought the attorney was concerned about legal repercussions from a legal point of view. That's strong evidence that it's not an accident. That's the kind of direct evidence, in addition to parallel conduct, that the Supreme Court says you have to consider. And Burgess, Justice Cook, in unanimous opinion, said that that could well be found to be a tort. I'm saying in Radarmo they even say it was done for the wrong reason, in which case it's evidence, and again, it gets back to Saranac. I think Saranac was good science, but even if it was bad science, if they did it for the wrong reason, that's evidence, direct evidence, that would support the fact that, as they're all not telling the exposed people, it's not coincidence. That's the kind of evidence McClure says we need, and that's why Saranac's put in. In the same way, if you look in the briefs, and I know at least two of you have referenced it in decisions you've written, the Lonza editing in 1935, the Lonza article edited by Johns Manville and Ray Bestas, the Asbestosis magazine being forced not to publish in 1936, I think that's referenced in Van Winkle, it's referenced in Burgess 1-2, it's referenced in McClure, and it's referenced in the Supreme Court in McClure, and in Dukes 1, Honeywell's not involved in that or Bindex, Avex isn't involved in that, but again, that's evidence that shows that these companies knew and the fact they didn't tell was not a coincidence. So I'm suggesting Burgess is what should be adhered to and should be followed, and I realize typically you follow, I just got a decision that White 2 was binding, I understand that. But here, when you've got a decision that says I'm not following the earlier opinions, I think that has a little less stare decisis, is that the word? Actually, none of it's binding. No decision of the appellate's corresponding on us. We're always a free agency. That's what we all think, you better not tell us that. No, no, Mr. Waller, I had a question about, it seems as though John Crane Inc. and Illinois Central Railroad Company got a special instruction on proximate cause, which was also requested by one or both of the defendants. Why wasn't it fair for them to get the same instruction as Crane and Illinois Central? Crane and Illinois Central were in on negligence only, and if it was determined that the conspiracy was what had caused it, then Crane and Illinois Central would walk, but the instructions as tendered by the defendants would have allowed a jury to say, one, we find ABEX acted wrongfully, which means it was part of the conspiracy, but we find the conduct was due to some other entity, or sole proximate cause was due to some other entity of conduct, that could have been a co-conspirator, which means ABEX shouldn't walk in that situation, it would be inaccurate. That's why the judge tried, he had a lot of varieties, and he tried to artfully find one that did differentiate, because since Crane and Illinois Central weren't part of the conspiracy, if it was due to some cause other than them, then even if it was one of the conspirator companies, they wouldn't be liable, but if ABEX, who was a conspirator, if the sole proximate cause of the conduct was Johns Manville, as part of the conspiracy, ABEX was liable, and that's how they came up with the instruction. I'd ask you to affirm, and if you look at the exhibits... Can you tell me the precise duty that defendants owe plaintiffs? Not to conspire, not to enter into an agreement by which Jane Minson, in her first real job, becomes a secretary in an office at age 19, and isn't told what these companies have known for decades, which is there's a good chance when you get 60 and you're working for the Chamber of Commerce you're going to find yourself dying of cancer. Is there any merit, I know you're out of time, but to the arguments that punitive damages were assessed at a significant amount, because the jury took into consideration these defendants had conspired over the many years and had harmed many, many consumers and other plaintiffs and other people who had suffered injury but not even sought any compensation. There's nothing to support that that's how the jury decided it, and we didn't argue that look how many have died or been killed, but the enormity of the wrong is one of the factors under IPI, and they were constructive and consistent with IPI, and you're right. Nobody on this side claims the amount, on the defense side, nobody claims the amount was excessive because they weren't in light of the statutory amounts. Neither one says the amounts were excessive. Wasn't there some dispute though about net worth of the subsidiary company? Of ABEX, and I can address that if you'll give me a minute or so, it's going to take about a minute. 60 seconds. 60 seconds, okay. I'm trying to keep, I want you all to have time to argue, we do try to follow the clock, but we're being a little more lenient today because that's normally not my procedure, but take a minute. All right. ABEX started, was a company that had started in 1902, had plants, tens of thousands of employees, there were spinoffs, resales, spinoffs, resales, and at the time of Troubles, two attorneys from East 63rd Street in New York, they had no quote tangible assets, they had made a contribution to another company in the holding company that owned Neumoy ABEX at that time. Their last tax return showed they were worth $283 million and had factories, a factory in Camden and so on. They just contributed all of that away, and yet they were still part of this group. They contributed to another part of the same group, and we tried to get an amount from Mr. Fassman, the attorney-slash-president, and actually when we broke for lunch, I think Mr. Simpson and I told Judge Prawl, actually Mr. Simpson said he's got Steven Fassman, we're going to get the amount, he came back in, and no criticism, Mr. Simpson is a very good attorney. I put Fassman on the stand and said, so how much, and he didn't have a number anymore. All he had was the bigger group. So the judge did give them the opportunity to put in an alternate amount. And I believe Mr. Simpson said that we're going to try and split it out, and in this trial Mr. Fassman refused when he came back from lunch. Thank you very much. Rebuttal now. Justice Turner, I'll try to respond to some of your questions on instructions. The sole proximate cause instruction, by denying it to us, prevented us from making the argument that the conduct of UNARCO, independent of any conspiracy, was the sole proximate cause of the occurrence. As far as the instruction on punitive damages, the United States Supreme Court, in the Philip Morris case, says that you should give an instruction that the jury should not take into account harm to other parties. Do you cite the Nolan case and the sole proximate cause instruction? Yes. Go ahead. Exhibit 641 is where Mr. Gardner, Dr. Gardner, less than a month after he writes 638 and 639, and 639 is the outline that explains why his findings are not significant. Small number of mice, no controls, and mice were used that were prone to tumors. In 641, writing to Dr. Hecton, he says, My results mean nothing. It is not unlawful not to publish results that mean nothing. It is not tortious. But it's certainly evidence of an agreement not to publish. That's correct, but the agreement has to be unlawful, and an act has to be tortious in order for civil conspiracy to exist. And the argument that Saranac is an overt act, what McClure says is the overt act has to be causally related to the plaintiff's injury. There's no relationship between what was published or not published in 1951 and what happened to Jane Minson at UNARCO. That wasn't planning, encouraging, or assisting UNARCO. That is divorced from what UNARCO did many years later. As this court knows, based on the Holmes and Rodarmo record and this record, a lot of things happened between 1951 and 1967, including the Bogner article that tied asbestos to mesothelioma, Sir Richard Dawes' article that established that. Everybody knew about it. No. When she was in. The Saranac issue relates to publications in medical journals, and by the time that Jane Minson went to work at UNARCO, there was a lot more in the medical journals, and so there's no causal connection between not publishing results that meant nothing to the researcher. Couldn't the jury find differently? Couldn't the jury find, like Mr. Wilder says, the whole purpose behind the Saranac maneuvers was to keep this information from getting out? We contend there's legally insufficient evidence for that. One of the big disagreements that Mr. Wilder and I have about this in conspiracy deals with the issue of self-interest. Someone acting in self-interest is not evidence of a conspiracy. It is equally evidence that someone is acting independently from any conspiracy because they're acting in self-interest, and that's the point that the Rodarmo Court made in applying the standard of clear and convincing evidence that someone is doing nothing but. . . Hey, it's going to harm our companies if our employees find out that they're being harmed by this product they're producing. Therefore, we're going to keep it secret. That's no big deal? There's no evidence that ABEX ever spoke with UNARCO about what UNARCO should do with respect to its employees. Thank you, sir. And last rebuttment by Mr. Haidt. Obviously, subject to questions, two points to make. First, when Mr. Wilder talked about the additional evidence in this case versus Rodarmo, the only thing he cited was plans except for 772, which is that John's. . . I don't know why we're worried about additional evidence from Rodarmo. You know, is Rodarmo right? Is Burgess right? The additional evidence has to come after McClure, it seems to me. Well, Your Honor, then I would point out that this Exhibit 772, which is a document. . . a John's Bandbud document, says what every employee should know is found in Bendix's files. If you turn to McClure and say, okay, what is the significance of that evidence? McClure said, much of the plan's additional evidence of the alleged agreement demonstrated only a sharing of information among those companies. Further down the page, the mere exchange of information by manufacturers of the same or similar products is a common practice, however, and does not support an inference of an agreement. So the fact . . . the one document that Mr. Wilder cites of evidence of an agreement is exactly what the Supreme Court in McClure said. It does not support an inference of an agreement, of a conspiracy. McClure seemed to indicate there was an agreement between Narco and John's Mansville, right? I think so. I think they assumed that. No one contested it. Narco and John's Mansville was a party in that case. I'm sorry if I didn't answer the question, Your Honor. And I . . . we should have had twice as much time for all this instead of this rapid fire argument. I understand. But go ahead. If I've answered your question, I don't mean to . . . That's okay. All right. Thank you, Your Honor. The second point I'd like to make is on this other company evidence. And on that point, before coming down here, I was reading the Thompson case from 1930, a case I had recited for several legal propositions. I had not realized in 1930 that Tribune sued the mayor of Chicago for a conspiracy to loot the city to benefit his machine. And they got a judgment for $2 million against the mayor. The Supreme Court, on appeal, reversed it. But in their discussion, it's very apropos of this issue because they went through the evidence against the mayor. And, for example, the Tribune put in evidence that the mayor had vetoed an ordinance that enabled this looting. And the Supreme Court said, well, that was at the advice of the city attorney, who is not alleged to be a conspirator. So that's not evidence of conspiracy. Similarly, they said that the mayor had allowed payments to be made to these people. And the Supreme Court said, wait, the fact that his conduct is like that of others who approve the payments doesn't prove anything because others are not part of the conspiracy. Following your logic, Tribune, that means the city treasurer is a conspirator because he did the same thing as the mayor, but he's not alleged to be a conspirator. The Supreme Court, 80 years ago, in deciding whether or not evidence of how someone acted is evidence of a conspiracy, specifically looked to the conduct of innocent third parties and said, well, look, you're acting like the innocent people, so that's not evidence you conspired. Are we sure all these other companies are innocent? They're not conspirators, Your Honor. There's been no claim any of them is a conspirator. And that's what innocent means in this context. Do you have to prove that to get their conduct admitted? No, Your Honor, I don't think I have to. I can prove what their conduct was, and there's no allegation they were conspirators. The federal government was a conspirator. They were not conspirators. Isn't it your burden to show that they were not before that evidence comes in? I don't believe so, Your Honor. I'm out of time. Okay. Thank you, Your Honors, for your attention. Thanks to all three of you. The case is submitted. The court stands in recess.